# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Case No. 16-cr-75-PB |
| | : | |
| v. | : | |
| | : | |
| ANDREW DUFRESNE | : | |
| | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE

Defendant Andrew Dufresne has filed a motion under 18 U.S.C. § 3582(c)(1)(A) asking the Court to release him from prison to home confinement, relying on the threat posed by the COVID-19 pandemic.  The United States respectfully opposes the motion because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.  The Court should deny the motion.

### Factual Background

On June 29, 2016, defendant pled guilty to a one-count information charging him with the unarmed robbery of a Manchester, New Hampshire bank on April 9, 2014.  In November 2016, the Court sentenced defendant to 63 months of imprisonment, with the sentence to be served consecutive to defendant's then-running state prison sentence out of Massachusetts. Apparently, in early 2019, Defendant was paroled from the Massachusetts prison into the Bureau of Prison's custody, at which time he began his federal sentence.  Defendant thus has served approximately 17 months of his sentence, and, according to BOP's inmate locator, has an estimated release date of August 16, 2013.  He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons relying on the threat posed by the COVID-19 pandemic.

I.      **The Prison Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.  In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.  BOP has explained, "[M]aintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP Covid-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began preparing for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (Covid-19) Action Plan ("Action Plan"), to minimize the risk of Covid-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP

institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for Covid-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for Covid-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted only to those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To

ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  As of today's date, BOP has placed 7,406 inmates on home confinement.  *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/ (last visited August 10, 2020).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the

greatest incidence of coronavirus transmission. *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/ (last visited August 10, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of Covid-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill.  But BOP must protect the health of its inmates and staff while also addressing other critical needs. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

According to BOP's statistics, as of August 9, 2020, 1,383 federal inmates and 571 BOP staff have confirmed positive test results for Covid-19 nationwide.  Some 9,483 inmates and 759 BOP have recovered from the disease, and 111 inmates and 1 staff member have died.  Currently, there are only three active staff cases, and zero active inmate cases, at the MDC Brooklyn facility.  *See* https://www.bop.gov/coronavirus/ (last visited August 10, 2020).

**II.     Defendant's Request for a Sentence Reduction**

Defendant has served approximately 17 months of his 63 month sentence (roughly 26.9%, not accounting for good time) and is currently housed at the Metropolitan Detention Center, or MDC, in Brooklyn, NY.

On April 15, 2020, the defendant submitted a formal request to the Warden at MDC Brooklyn for a sentence reduction on Compassionate Release grounds. On April 30, 2020, he received a denial letter noting that defendant had not provided any "additional evidence or information in support of the request." *See* Dkt. No. 23-2.  Defendant apparently appealed that determination on May 15, and has not received a response.  The May 15, 2020 request triggered the 30-day rule, and Defendant has therefore exhausted his BOP administrative remedies and met the requirements of § 3582(c)(1)(A).

**Legal Framework**

Under § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf.  18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and

(ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).  As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

  (I)     suffering from a serious physical or medical condition,

  (II)    suffering from a serious functional or cognitive impairment, or

  (III)   experiencing deteriorating physical or mental health because of the aging process,

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

> that substantially diminishes the ability of the defendant to provide self-care
>
> within the environment of a correctional facility and from which he or she is not
>
> expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

### Argument

The Court should deny Defendant's motion for a reduction in his sentence.  The government agrees that Defendant's health conditions meet the threshold requirement of "extraordinary and compelling reasons."  USSG § 1B1.13, cmt. n.1(A).  In particular, defendant's diagnosis of chronic obstructive pulmonary disease, or COPD, places him at an increased risk of severe illness from Covid-19 according to the latest CDC Guidelines.  *See* CDC Coronavirus Information, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/groups-at-higher-risk.html (last updated July 30, 2020; last visited Aug. 10, 2020).

The existence of underlying health conditions does not end the inquiry, however, as defendant has not demonstrated that he is no longer a danger to public safety and that the sentencing factors under 18 U.S.C. § 3553(a) weigh in favor of his release.  *See* 18 U.S.C. § 3582(c)(1)(A) (the court must consider the § 3553(a) factors, as "applicable," in determining whether a sentence reduction is warranted); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020) (applying § 3553(a) factors to compassionate release request).  The factors that the Court

must consider under § 3553(a) include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and also the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner."

Revisiting defendant's conduct and characteristics and history is an important part of the Court's analysis.  Defendant pled guilty to the unarmed robbery of a bank in Manchester, New Hampshire, after which he fled to Massachusetts.  When local police there attempted to arrest him, he fled by vehicle and crashed.  PSR ¶ 9.  At the time of the offense in April 2014, defendant was 42 years old, and had accumulated a massive array of felony convictions as an adult.  The PSR reflects that record in detail, including defendant's past convictions, among others, for assault and battery, breaking and entering, attempted burglary, burglary, larceny and receiving stolen property.   PSR ¶¶ 45-62.  Added up, defendant had accumulated an astonishing 43 criminal history points, placing him in Criminal History Category VI.  PSR ¶ 65.   Defendant had spent the better part of his adulthood repeatedly committing crimes and his lengthy incarceration was justifiably necessary to both deter defendant from further crimes and to protect the public from the defendant.

At the time of sentencing, the Court could have decided to run defendant's federal sentence concurrent with his then-existing Massachusetts state prison sentence.  PSR ¶ 62.  Indeed, defendant requested a concurrent sentence in his sentencing memorandum.  *See* Dkt. No. 14 at 2.  The Court declined to take defendant up on this request, presumably for the reasons identified above regarding the nature and circumstances of the offense, the history and

characteristics of the defendant, and the need for the sentence to provide adequate deterrence, among the other § 3553(a) factors.  Those reasons remain in full force today, with defendant having served only 17 months of his 63 month sentence.  In sum, the § 3553(a) factors weigh against defendant's release from prison.

## Conclusion

The 63-month prison sentence the Court imposed in this case was just punishment that reflected the seriousness of the defendant's crimes and promoted respect for the law. It took into account the defendant's history and characteristics and the nature and circumstances of his offense, and it provided for both specific and general deterrence. Those justifications for the defendant's sentence are as apt today as they were when the sentence was imposed in 2016. Reducing the defendant's sentence when he has served just 17 months of his 63 month sentence, and even when considered in light of the coronavirus pandemic, would undermine the core goals of sentencing in this case and is unwarranted.

For these reasons, this Court should deny the defendant's motion for a sentence reduction.

Respectfully submitted,

SCOTT W. MURRAY
UNITED STATES ATTORNEY

Dated: August 10, 2020

By: /s/ Charles L. Rombeau
Charles L. Rombeau
Assistant United States Attorney
NY Bar No. 4326500
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552
charles.rombeau@usdoj.gov